June 20, 2023

Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      Re:    *Carpenter v. Allen,*
               Docket Nos. 22-1057, 22-1061(XAP)

Dear Ms. Wolfe:

Pursuant to Rule 28(j), this letter is to advise the Court of two recent decisions from the Supreme Court that will have a major impact on the future of the litigation between the parties in *Carpenter v. Allen*. The first case, *Binday v. United States*, is included as Exhibit One and resulted in the Defendants in *Binday* having their convictions vacated based on the Supreme Court's unanimous decision in *Ciminelli v. United States* (Exhibit Two), which effectively abrogated and reversed a number of convictions involving the Second Circuit's "Right to Control" Theory of Fraud. The Government has already begun to advise people to stop collecting restitution on cases involving the "Right to Control" Theory. See e.g., Notice to Trevon Gross attached as Exhibit Three.

The gist of the Government-Appellants' appeal of Judge Underhill's three Orders over the past eight years is that Mr. Carpenter might succeed in his efforts to vacate his conviction and the Government will need the property unlawfully seized in two raids in 2010 and 2011 for what the Government believes will be a second trial for Mr. Carpenter.

But the Double Jeopardy Clause of the Constitution precludes any such second trial because: "In essence, the Double Jeopardy Clause protects criminal defendants against three things: (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *United States v. Olmeda*, 461 F.3d 271, 279 (2d Cir. 2006).

The Government's claim that it must withhold the unlawfully seized property from the innocent Grist Mill Capital LLC is also dubious because the Government claimed in 2019 that it had all of the evidence that it needed and there was no evidence illegally seized from Mr. Carpenter's office that it needed for any future trial. See Government's Rule 28(j) Letter attached as Exhibit Four. So, there is no further evidence that the Government needs to retain for a hypothetical second trial.

By: _/s/ Jonathan J. Einhorn_
JONATHAN J. EINHORN
129 WHITNEY AVENUE
NEW HAVEN, CT 06510
FEDERAL BAR NO. ct00163
EINHORNLAWOFFICE@GMAIL.COM

# EXHIBIT ONE

Binday v. United States

# Supreme Court of the United States
# Office of the Clerk
# Washington, DC 20543-0001

**Scott S. Harris**
Clerk of the Court
(202) 479-3011

May 22, 2023

Clerk
United States Court of Appeals for the Second
Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: Michael L. Binday
v. United States
No. 21-1241
(Your No. 21-1206)

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of *Ciminelli* v. *United States*, 598 U. S. ___ (2023).

The judgment or mandate of this Court will not issue for at least thirty-two days pursuant to Rule 45. Should a petition for rehearing be filed timely, the judgment or mandate will be further stayed pending this Court's action on the petition for rehearing.

Sincerely,

*Scott S. Harris*

**Scott S. Harris**, Clerk

# EXHIBIT TWO

Ciminielli v. United States

# Supreme Court of the United States
# Office of the Clerk
# Washington, DC  20543-0001

**Scott S. Harris**
Clerk of the Court
(202) 479-3011

May 11, 2023

Clerk
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

> Re:  Louis Ciminelli
>  v. United States, et al.
> No. 21-1170
> (Your No. 18-3710, 18-3712, 18-3715, 18-3850)

Dear Clerk:

The opinion of this Court was announced today in the above stated case. A copy of the opinion is available on the Court's website at www.supremecourt.gov.

The judgment or mandate of this Court will not issue for at least twenty-five days pursuant to Rule 45.  Should a petition for rehearing be filed timely, the judgment or mandate will be further stayed pending this Court's action on the petition for rehearing.

Sincerely,

**Scott S. Harris**, Clerk

by

Laurie Wood
Deputy Clerk
(202) 479-3031

(Slip Opinion)         OCTOBER TERM, 2022         1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CIMINELLI *v.* UNITED STATES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 21–1170. Argued November 28, 2022—Decided May 11, 2023

Petitioner Louis Ciminelli was convicted of federal wire fraud for his involvement in a scheme to rig the bid process for obtaining state-funded development projects associated with then-New York Governor Andrew Cuomo's Buffalo Billion initiative. The Buffalo Billion initiative was administered by the nonprofit Fort Schuyler Management Corporation. Investigations uncovered that Fort Schuyler board member Alain Kaloyeros paid lobbyist Todd Howe $25,000 in state funds each month to ensure that the Cuomo administration gave Kaloyeros a prominent role in administering projects for Buffalo Billion. Ciminelli's construction company, LPCiminelli, paid Howe $100,000 to $180,000 each year to help it obtain state-funded jobs. In 2013, Howe and Kaloyeros devised a scheme whereby Kaloyeros would tailor Fort Schuyler's bid process to smooth the way for LPCiminelli to receive major Buffalo Billion contracts by designating LPCiminelli as a "preferred developer" with priority status to negotiate for specific projects. Kaloyeros, Howe, and Ciminelli jointly developed a set of requests for proposal (RFPs) that effectively guaranteed LPCiminelli's selection as a preferred developer by treating unique aspects of LPCiminelli as qualifications for preferred-developer status. With that status in hand, LPCiminelli secured the marquee $750 million "Riverbend project" in Buffalo. After the scheme was uncovered, Ciminelli, Kaloyeros, Howe, and others were indicted for, as relevant here, wire fraud in violation of 18 U. S. C. §1343 and conspiracy to commit the same under §1349.

In the operative indictment and at trial, the Government relied solely on the Second Circuit's right-to-control theory of wire fraud, under which the Government can establish wire fraud by showing that

2                    CIMINELLI *v.* UNITED STATES

Syllabus

the defendant schemed to deprive a victim of potentially valuable eco-
nomic information necessary to make discretionary economic deci-
sions. Consistent with that theory, the District Court instructed the
jury that the term "property" in §1343 "includes intangible interests
such as the right to control the use of one's assets," which could be
harmed by depriving Fort Schuyler of "potentially valuable economic
information." The jury convicted Ciminelli of wire fraud and conspir-
acy to commit wire fraud. On appeal, Ciminelli argued that the right
to control one's assets is not "property" for purposes of §1343. The Sec-
ond Circuit affirmed the convictions on the basis of its longstanding
right-to-control precedents.

*Held*: Because the right to valuable economic information needed to
make discretionary economic decisions is not a traditional property in-
terest, the Second Circuit's right-to-control theory cannot form the ba-
sis for a conviction under the federal fraud statutes. Pp. 4–10.

(a) The federal wire fraud statute criminalizes the use of interstate
wires for "any scheme or artifice to defraud, or for obtaining money or
property by means of false or fraudulent pretenses, representations, or
promises." 18 U. S. C. §1343. When the federal wire fraud statute
was enacted, the "common understanding" of the words "to defraud"
referred "to wronging one in his property rights." *Cleveland* v. *United
States,* 531 U. S. 12, 19. This Court has therefore consistently under-
stood the statute's "money or property" requirement as limiting the
"scheme or artifice to defraud" element. *Ibid.* Even so, lower federal
courts for decades interpreted the mail and wire fraud statutes to pro-
tect intangible interests unconnected to traditional property rights.
See *Skilling* v. *United States,* 561 U. S. 358, 400. This Court halted
that trend in *McNally* v. *United States,* 483 U. S. 350, which confined
the statutes to the "protect[ion of] individual property rights." *Id.,* at
359, n. 8.

The right-to-control theory cannot be squared with the text of the
federal fraud statutes, which are "limited in scope to the protection of
property rights." *Id.,* at 360. The so-called right to control is not an
interest that had "long been recognized as property" when the wire
fraud statute was enacted. *Carpenter* v. *United States,* 484 U. S. 19,
26. From the theory's inception, the Second Circuit has not grounded
the right to control in traditional property notions. The theory is also
inconsistent with the structure and history of the federal fraud stat-
utes. Congress responded to this Court's decision in *McNally* by en-
acting §1346, which revived only the intangible right of honest ser-
vices, one of many intangible rights protected by courts under the
fraud statutes pre-*McNally.* Congress' silence regarding other such
intangible interests forecloses the judicial expansion of the wire fraud
statute to cover the intangible right to control. Finally, by treating

Cite as: 598 U. S. ____ (2023)　　　　　3

Syllabus

mere information as the protected interest, the right-to-control theory vastly expands federal jurisdiction to an almost limitless variety of deceptive actions traditionally left to State law. Pp. 4–9.

(b) Despite relying exclusively on the right-to-control theory before the grand jury, District Court, and Second Circuit, the Government now concedes that the theory as articulated below is erroneous. Yet, the Government insists that the Court can affirm Ciminelli's convictions by applying facts presented to the jury below to the elements of a different wire fraud theory. The Court declines the Government's request, which would require the Court to assume not only the function of a court of first view, but also of a jury. See *McCormick* v. *United States,* 500 U. S. 257, 270–271, n. 8. Pp. 9–10.

13 F. 4th 158, reversed and remanded.

THOMAS, J., delivered the opinion for a unanimous Court. ALITO, J., filed a concurring opinion.

Cite as: 598 U. S. ____ (2023)     1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 21–1170

LOUIS CIMINELLI, PETITIONER v.
UNITED STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 11, 2023]

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we must decide whether the Second Circuit's longstanding "right to control" theory of fraud describes a valid basis for liability under the federal wire fraud statute, which criminalizes the use of interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1343. Under the right-to-control theory, a defendant is guilty of wire fraud if he schemes to deprive the victim of "potentially valuable economic information" "necessary to make discretionary economic decisions." *United States* v. *Percoco*, 13 F. 4th 158, 170 (CA2 2021) (internal quotation marks omitted). Petitioner Louis Ciminelli was charged with, tried for, and convicted of wire fraud under this theory. And the Second Circuit affirmed his convictions on that same basis.

We have held, however, that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests. *Cleveland* v. *United States*, 531 U. S. 12, 24 (2000). Because "potentially valuable economic in-

2                 CIMINELLI *v.* UNITED STATES

                    Opinion of the Court

formation" "necessary to make discretionary economic deci-
sions" is not a traditional property interest, we now hold
that the right-to-control theory is not a valid basis for lia-
bility under §1343. Accordingly, we reverse the Second Cir-
cuit's judgment.

                              I

    This case begins with then-New York Governor Andrew
Cuomo's "Buffalo Billion" initiative. On its face, the initia-
tive was administered through Fort Schuyler Management
Corporation, a nonprofit affiliated with the State Univer-
sity of New York (SUNY) and the SUNY Research Founda-
tion. It aimed to invest $1 billion in development projects
in upstate New York. Later investigations, however, un-
covered a wide-ranging scheme that involved several of for-
mer Governor Cuomo's associates, most notably Alain Kalo-
yeros and Todd Howe. Kaloyeros was a member of Fort
Schuyler's board of directors and was in charge of develop-
ing project proposals for Buffalo Billion; Howe was a lobby-
ist who had deep ties to the Cuomo administration. Each
month, Kaloyeros paid Howe $25,000 in state funds to en-
sure that the Cuomo administration gave Kaloyeros a
prominent position in Buffalo Billion.
    Ciminelli had a similar arrangement. His construction
company, LPCiminelli, paid Howe $100,000 to $180,000
each year to help it obtain state-funded jobs. In 2013, Howe
and Kaloyeros devised a scheme whereby Kaloyeros would
tailor Fort Schuyler's bid process to smooth the way for
LPCiminelli to receive major Buffalo Billion contracts.
First, on Kaloyeros' suggestion, Fort Schuyler established a
process for selecting "preferred developers" that would be
given the first opportunity to negotiate with Fort Schuyler
for specific projects. Then, Kaloyeros, Howe, and Ciminelli
jointly developed a set of requests for proposal (RFPs) that
treated unique aspects of LPCiminelli as qualifications for

Cite as: 598 U. S. ____ (2023)          3

Opinion of the Court

preferred-developer status. Those RFPs effectively guaran-
teed that LPCiminelli would be (and was) selected as a pre-
ferred developer for the Buffalo projects. With that status
in hand, LPCiminelli secured the marquee $750 million
"Riverbend project" in Buffalo.

After an investigation revealed their scheme, Ciminelli,
Howe, Kaloyeros, and several others were indicted by a fed-
eral grand jury on 18 counts including, as relevant here,
wire fraud in violation of 18 U. S. C. §1343 and conspiracy
to commit wire fraud in violation of §1349.

Throughout the grand jury proceedings, trial, and appeal,
the Government relied on the Second Circuit's "right to con-
trol" theory, under which the Government can establish
wire fraud by showing that the defendant schemed to de-
prive a victim of potentially valuable economic information
necessary to make discretionary economic decisions. The
Government's indictment and trial strategy rested solely on
that theory.[1] And, it successfully defeated Ciminelli and his
codefendants' motion to dismiss by relying on that theory.
In addition, it successfully moved the District Court to ex-
clude certain defense evidence as irrelevant to that theory.
The Government also relied on that theory in its summa-
tion to the jury.

Consistent with the right-to-control theory, the District
Court instructed the jury that the term "property" in §1343
"includes intangible interests such as the right to control
the use of one's assets." App. 41. The jury could thus find
that the defendants harmed Fort Schuyler's right to control

---

[1] An earlier indictment alleged that the Buffalo Billion contracts were
the property at issue. But, to defend against the defendants' motion to
dismiss, the Government relied solely on the theory that the scheme "de-
fraud[ed] Fort Schuyler of its right to control its assets." App. 31–32.
The District Court then relied expressly on the right-to-control theory in
denying the motion to dismiss. *United States* v. *Percoco*, 2017 WL
6314146, *8 (SDNY, Dec. 11, 2017).

4          CIMINELLI *v.* UNITED STATES

Opinion of the Court

its assets if Fort Schuyler was "deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Ibid.* The District Court further defined "economically valuable information" as "information that affects the victim's assessment of the benefits or burdens of a transaction, or relates to the quality of goods or services received or the economic risks of the transaction." *Ibid.* The jury found Ciminelli guilty of wire fraud and conspiracy to commit wire fraud and the District Court sentenced him to 28 months' imprisonment followed by 2 years' supervised release.

On appeal, Ciminelli challenged the right-to-control theory, arguing that the right to control one's assets is not "property" for purposes of the wire fraud statute. Defending the wire fraud convictions, the Government relied solely on the right-to-control theory. The Second Circuit affirmed the convictions based on its longstanding right-to-control precedents, holding that, by "rigging the RFPs to favor their companies, defendants deprived Fort Schuyler of potentially valuable economic information." 13 F. 4th, at 171 (internal quotation marks omitted).

We granted certiorari to determine whether the Second Circuit's right-to-control theory of wire fraud is a valid basis for liability under 18 U. S. C. §1343. 597 U. S. ___ (2022). And, we now hold that it is not.

## II

### A

The wire fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." §1343. Although the statute is phrased in the disjunctive, we have consistently understood the "money or property" requirement to limit the "scheme or artifice to defraud" element because the "common understanding" of the words "to defraud" when the statute was enacted referred

Cite as: 598 U. S. ____ (2023)          5

Opinion of the Court

"to wronging one in his property rights." *Cleveland*, 531 U. S., at 19 (internal quotation marks omitted).[2] This understanding reflects not only the original meaning of the text, but also that the fraud statutes do not vest a general power in "the Federal Government . . . to enforce (its view of) integrity in broad swaths of state and local policymaking." *Kelly* v. *United States*, 590 U. S. ___, ___ (2020) (slip op., at 12). Instead, these statutes "protec[t] property rights only." *Cleveland*, 531 U. S., at 19. Accordingly, the Government must prove not only that wire fraud defendants "engaged in deception," but also that money or property was "an object of their fraud." *Kelly*, 590 U. S., at ___ (slip op., at 7) (alterations omitted).

Despite these limitations, lower federal courts for decades interpreted the mail and wire fraud statutes to protect intangible interests unconnected to traditional property rights. See *Skilling* v. *United States*, 561 U. S. 358, 400 (2010) (recounting how "the Courts of Appeals, one after another, interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights"). For example, federal courts held the fraud statutes reached such intangible interests as the right to "honest services," *ibid.* (internal quotation marks omitted); the right of the citizenry to an honest election, see *United States* v. *Girdner*, 754 F. 2d 877, 880 (CA10 1985); and the right to privacy, *United States* v. *Louderman*, 576 F. 2d 1383, 1387 (CA9 1978). In *McNally* v. *United States*, 483 U. S. 350 (1987), this Court halted that trend by confining the federal fraud statutes to their original station, the "protect[ion of] individual property rights." *Id.*, at 359, n. 8. Congress then amended the fraud statutes "specifically to cover one of the 'intangible rights' that lower courts

_____

[2] Although *Cleveland* involved the mail fraud statute, 18 U. S. C. §1341, "we have construed identical language in the wire and mail fraud statutes *in pari materia*." *Pasquantino* v. *United States*, 544 U. S. 349, 355, n. 2 (2005).

6          CIMINELLI *v.* UNITED STATES

Opinion of the Court

had protected under [the statutes] prior to *McNally*: 'the in-
tangible right of honest services.'" *Cleveland*, 531 U. S., at
19–20 (quoting 18 U. S. C. §1346).

The right-to-control theory applied below first arose after
*McNally* prevented the Government from basing federal
fraud convictions on harms to intangible interests uncon-
nected to property. See *United States* v. *Wallach*, 935 F. 2d
445, 461–464 (CA2 1991). As developed by the Second Cir-
cuit, the theory holds that, "[s]ince a defining feature of
most property is the right to control the asset in question,"
"the property interests protected by the wire fraud statute
include the interest of a victim in controlling his or her own
assets." *United States* v. *Lebedev*, 932 F. 3d 40, 48 (2019)
(alterations omitted). Thus, a "cognizable harm occurs
where the defendant's scheme denies the victim the right to
control its assets by depriving it of information necessary to
make discretionary economic decisions." *United States* v.
*Binday*, 804 F. 3d 558, 570 (CA2 2015) (alterations omit-
ted).[3]

The right-to-control theory cannot be squared with the
text of the federal fraud statutes, which are "limited in
scope to the protection of property rights." *McNally*, 483
U. S., at 360. The so-called "right to control" is not an in-
terest that had "long been recognized as property" when the
wire fraud statute was enacted. *Carpenter* v. *United States*,
484 U. S. 19, 26 (1987). Significantly, when the Second Cir-
cuit first recognized the right-to-control theory in 1991—
decades after the wire fraud statute was enacted and over
a century after the mail fraud statute was enacted—it could

---

[3] At least two Circuits have expressly repudiated the right-to-control
theory of wire fraud. *United States* v. *Sadler*, 750 F. 3d 585, 590–592
(CA6 2014); *United States* v. *Bruchhausen*, 977 F. 2d 464, 467–469 (CA9
1992). Several other Circuits have embraced the theory to varying de-
grees. See, *e.g.*, *United States* v. *Gray*, 405 F. 3d 227, 234 (CA4 2005)
(collecting cases).

Cite as: 598 U. S. ____ (2023)          7

Opinion of the Court

cite no authority that established "potentially valuable eco-
nomic information" as a traditionally recognized property
interest.  See *Wallach*, 935 F. 2d, at 462–463.[4]  And, the
Second Circuit has not since attempted to ground the right-
to-control theory in traditional property notions.  We have
consistently rejected such federal fraud theories that "stray
from traditional concepts of property."  *Cleveland*, 531
U. S., at 24.  For its part, the Government—despite relying
upon the right-to-control theory for decades, including in
this very case—now concedes that if "the right to make in-
formed decisions about the disposition of one's assets, with-
out more, were treated as the sort of 'property' giving rise
to wire fraud, it would risk expanding the federal fraud
statutes beyond property fraud as defined at common law
and as Congress would have understood it."  Brief for
United States 25–26.  Thus, even the Government now
agrees that the Second Circuit's right-to-control theory is
unmoored from the federal fraud statutes' text.

––––––––––

[4] The only judicial authority the Second Circuit cited for this key prop-
osition was a 1989 Fifth Circuit opinion that conclusorily asserted that
"[t]he economic value of . . . knowledge" was "sufficient 'property' to im-
plicate" the mail fraud statute, and that appears to have misunderstood
18 U. S. C. §1346 as "eliminating the requirement of property loss" in all
cases.  *United States* v. *Little*, 889 F. 2d 1367, 1368–1369.  The Second
Circuit then proceeded to rely on the "bundle of sticks" metaphor of prop-
erty rights.  See *United States* v. *Wallach*, 935 F. 2d 445, 463 (1991)
("[G]iven the important role that information plays in the valuation of a
corporation, the right to complete and accurate information is one of the
most essential sticks in the bundle of rights that comprise a stockholder's
property interest").  But that metaphor—whatever its merits in other
contexts—cannot compensate for the absence of an interest that itself
"has long been recognized as property," *Carpenter* v. *United States*, 484
U. S. 19, 26 (1987), particularly in light of our rejection of attempts to
construe the federal fraud statutes "in a manner that leaves [their] outer
boundaries ambiguous."  *McNally* v. *United States*, 483 U. S. 350, 360
(1987).  As noted above, the right to information necessary to make in-
formed economic decisions, while perhaps useful for protecting and mak-
ing use of one's property, has not itself traditionally been recognized as
a property interest.

8          CIMINELLI *v.* UNITED STATES

Opinion of the Court

The right-to-control theory is also inconsistent with the structure and history of the federal fraud statutes. As recounted above, after *McNally* put an end to federal courts' use of mail and wire fraud to protect an ever-growing swath of intangible interests unconnected to property, Congress responded by enacting §1346, which—despite the wide array of intangible rights courts protected under the fraud statutes pre-*McNally*—revived "*only* the intangible right of honest services." *Cleveland,* 531 U. S., at 19–20 (emphasis added). "Congress' reverberating silence about other [such] intangible interests" forecloses the expansion of the wire fraud statute to cover the intangible right to control. *United States* v. *Sadler*, 750 F. 3d 585, 591 (CA6 2014).

Finally, the right-to-control theory vastly expands federal jurisdiction without statutory authorization. Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal. See, *e.g., United States* v. *Viloski*, 557 Fed. Appx. 28 (CA2 2014) (affirming right-to-control conviction based on an employee's undisclosed conflict of interest). The theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction with our caution that, "[a]bsent [a] clear statement by Congress," courts should "not read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States." *Cleveland,* 531 U. S., at 27. And, as it did below, the Second Circuit has employed the theory to affirm federal convictions regulating the ethics (or lack thereof) of state employees and contractors—despite our admonition that "[f]ederal prosecutors may not use property fraud statutes to set standards of disclosure and good government for state and local officials." *Kelly,* 590 U. S., at ___ (slip op., at 12) (alterations omitted). The right-to-control theory thus criminalizes traditionally civil matters and federalizes traditionally state matters.

Cite as: 598 U. S. ____ (2023)　　　　9

Opinion of the Court

In sum, the wire fraud statute reaches only traditional property interests. The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest. Accordingly, the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes.

B

Despite indicting, obtaining convictions, and prevailing on appeal based solely on the right-to-control theory, the Government now concedes that the theory as articulated below is erroneous. Brief for United States 24–26. The Government frankly admits that, "to the extent that language in the [Second Circuit's] opinions might suggest that depriving a victim of economically valuable information, without more, necessarily qualifies as 'obtaining money or property' within the meaning of the fraud statutes, that is incorrect." *Id.*, at 24. That should be the end of the case.

Yet, the Government insists that its concession does not require reversal because we can affirm Ciminelli's convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory. *Id.*, at 31–32. With profuse citations to the records below, the Government asks us to cherry-pick facts presented to a jury charged on the right-to-control theory and apply them to the elements of a *different* wire fraud theory in the first instance. In other words, the Government asks us to assume not only the function of a court of first view, but also of a jury. That is not our role. See, *e.g.*, *McCormick* v. *United States*, 500 U. S. 257, 270–271, n. 8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury"); *Chiarella* v. *United States*, 445 U. S. 222, 236 (1980). Accordingly, we decline the Government's request to affirm Ciminelli's convictions on alternative grounds.

10                    CIMINELLI *v.* UNITED STATES

                           Opinion of the Court

                                  III

    The right-to-control theory is invalid under the federal
fraud statutes. We, therefore, reverse the judgment of the
Court of Appeals and remand the case for further proceed-
ings consistent with this opinion.

                                              *It is so ordered.*

Cite as: 598 U. S. ____ (2023)  1

ALITO, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 21–1170

## LOUIS CIMINELLI, PETITIONER *v.*
## UNITED STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 11, 2023]

JUSTICE ALITO, concurring.

The opinion of the Court correctly answers the sole question posed to us: whether the right-to-control theory supports liability under the federal wire fraud statute. The jury instructions embody that theory, and therefore this error, unless harmless, requires the reversal of the judgment below. I do not understand the Court's opinion to address fact-specific issues on remedy outside the question presented, including: (1) petitioner's ability to challenge the indictment at this stage of proceedings, see Fed. Rule Crim. Proc. 12(b)(3)(B); (2) the indictment's sufficiency, see *United States* v. *Miller*, 471 U. S. 130, 134–135 (1985) (variance from indictment did not make indictment insufficient); (3) the applicability of harmless error to particular invocations of the right-to-control theory during trial, see *Neder* v. *United States*, 527 U. S. 1, 15 (1999) (omission of element in jury instructions subject to harmless error); and (4) the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts. On this understanding, I join the Court's opinion.

# EXHIBIT THREE

## Restitution Cases

From: "Robinson, LaKisha (USANYS)" <LaKisha.Robinson@usdoj.gov>
Date: May 31, 2023 at 5:42:07 PM EDT
To: bfloyd@hopecathedral.com
Subject: RE: [EXTERNAL] Trevon Gross payment

Hello Ms. Floyd,

Please do not send June or any payments going forward at this time for Trevon Gross.
We received payment for May
I will send you a letter as well.
Thank You,
Lakisha

FYI

Subject: PLEASE READ!!! Supreme Court vacated judgment of several defendants - 12 Cr 152 and 15 CR 769

The U.S. Supreme Court has vacated the judgments entered in the cases below. The Court further instructed that the cases be returned to the district court for further proceedings. At this point, we have no idea whether the Office will pursue different charges against these defendants. In any case, because the judgments (imposing restitution) have been vacated, please suspend any collection for the foreseeable future. That means we should remove these defendants from TOP and stop any ongoing wage garnishments. Thanks, and please contact me if there are any questions.


John E. Gura, Jr.
Assistant United States Attorney
Southern District of New York
Tel. (212) 637-2712
Email: john.gura@usdoj.gov

# EXHIBIT FOUR

Government Rule 28(j) Letter



**United States Department of Justice**

*United States Attorney*
*District of Connecticut*

---

*Connecticut Financial Center*          *(203) 821-3700*
*157 Church Street, 25th Floor*          *Fax (203) 773-5376*
*New Haven, Connecticut 06510*          *www.justice.gov/usao/ct*

August 19, 2019

Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      Re:   *United States v. Carpenter*
            Docket No. 19-70

Dear Ms. Wolfe:

      Pursuant to Fed. R. App. P. 28(j), this letter is to advise the Court of the following decision: *United States v. DiTomasso*, No. 17-1699, 2019 WL 3417264 (2d Cir. July 30, 2019). This case has bearing on the government's argument, at pages 48-50 and 77-79 of its brief, that Mr. Carpenter lacked a reasonable expectation of privacy (*i.e.*, standing) to seek suppression of trial evidence obtained from the execution of two searches—one in 2010 and one in 2011—at the offices of the Charter Oak Trust, and that any error was harmless in light of the other evidence properly admitted.

      In *DiTomasso*, this Court rejected the defendant's suppression challenge as to some of the seized material in part because that material was "not offered or admitted at trial." *DiTomasso*, 2019 WL 3417264 at *6. Similarly, in this case, almost none of the material from Carpenter's own office—the only material in which he *may* have had a reasonable expectation of privacy—was introduced as evidence at trial. Only one document from the 2010 search that was admitted at trial came from Carpenter's office. *See* Gov't Br. at 49-50, 78. At most 14 trial exhibits (and 4 parts of composite exhibits) from the 2011 search potentially *could* have come from Carpenter's office (the record was undeveloped on this point). *See id.* at 78-79. The rest of the material coming from Carpenter's office was not admitted at trial and thus, under *DiTomasso*, should not factor in the Court's decision. Moreover, since none of the evidence from Carpenter's office would have affected "in some material

respect" the district court's judgment, *id*. at 77-78, its admission—even if error—was harmless.

I respectfully request that a copy of this letter be circulated to each of the panel members assigned to this case.

<div style="margin-left: 50%;">

Very truly yours,

JOHN H. DURHAM
UNITED STATES ATTORNEY

NEERAJ N. PATEL
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEYS

</div>

cc:   Michael A. Levy, Esq. (via ECF)
      Qais Ghafary, Esq. (via ECF)